Appeal No. 22-56206

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

————————————————

U.S. SECURITIES & EXCHANGE COMMISSION,
*Plaintiff-Appellee,*

*v.*

KIM H. PETERSON, PETERSON,
INDIVIDUALLY, AND AS TRUSTEE OF THE PETERSON FAMILY TRUST
DATED APRIL 14, 1992, AND AS TRUSTEE OF THE PETERSON FAMILY TRUST
DATED SEPTEMBER 29, 1983; ET AL.,
*Appellants,*

*v.*

KRISTA FREITAG,
RECEIVER FOR ANI DEVELOPMENT, LLC, AMERICAN NATIONAL
INVESTMENTS, INC., AND THEIR SUBSIDIARIES AND AFFILIATES,
*Receiver-Appellee,*

CHICAGO TITLE COMPANY, ET AL.,
*Defendants-Appellees,*

NOSSAMAN LLP; MARCO COSTALES,
*Real-party-in-interest-Appellees,*

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
THE HONORABLE LARRY A. BURNS, JUDGE
CASE NO. 3:19-CV-01628-LAB-AHG

————————————————

## APPELLEES CHICAGO TITLE COMPANY AND CHICAGO TITLE INSURANCE COMPANY'S SUR-REPLY BRIEF

————————————————

COMPLEX APPELLATE
LITIGATION GROUP LLP

BEN FEUER
96 JESSIE STREET
SAN FRANCISCO, CA 94105
(415) 649-6700
BEN.FEUER@CALG.COM

REX S. HEINKE
JESSICA M. WEISEL
355 SOUTH GRAND AVE.
SUITE 2450
LOS ANGELES, CA 90071
(213) 878-0404
REX.HEINKE@CALG.COM
JESSICA.WEISEL@CALG.COM

JOHANNA S. SCHIAVONI
600 WEST BROADWAY, SUITE 700
SAN DIEGO, CA 92101
(619) 642-2929
JOHANNA.SCHIAVONI@CALG.COM

COOLEY LLP
STEVEN M. STRAUSS
MEGAN DONOHUE
10265 SCIENCE CENTER DRIVE
SAN DIEGO, CA 92121-1117
(858) 550-6085
SMS@COOLEY.COM
MDONOHUE@COOLEY.COM

HAHN LOESER & PARKS LLP
STEVEN A. GOLDFARB
600 WEST BROADWAY
SUITE 1500
SAN DIEGO, CA 92101-3384
(619) 810-4314
SAGOLDFARB@HAHNLAW.COM

*Attorneys for Defendants-Appellees*
*Chicago Title Company & Chicago Title Insurance Company*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

1. Peterson forfeited his "traditional equity" argument, which also fails on the merits.................................................................... 1

2. Peterson forfeited his argument concerning "nonconsensual, uncompensated releases," which likewise fails. ............................. 6

3. Peterson's due process and Seventh Amendment arguments are forfeited and fail. ................................................................... 7

CONCLUSION ........................................................................... 8

CERTIFICATE OF COMPLIANCE ........................................................... 9

ADDENDUM OF STATUTORY CITATIONS ..................................... A-1

ADDENDUM OF CITATIONS NOT EASILY ACCESSIBLE ............ A-2

# TABLE OF AUTHORITIES

**Page**

CASES

*AlohaCare v. Hawaii, Dep't of Human Servs.*,
  572 F.3d 740 (9th Cir. 2009) ............................................................ 1

*Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*,
  59 F.4th 772 (6th Cir. 2023) .................................................... 3, 4, 5

*Greenwood v. FAA*,
  28 F.3d 971 (9th Cir. 1994) ............................................................ 1

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ............................................................... 1, 2, 5

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. __, 144 S. Ct. 2071 (2024) ................................................ 3

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
  971 F.3d 1042 (9th Cir. 2020) ........................................................ 1

*SEC v. DeYoung*,
  850 F.3d 1172 (10th Cir. 2017) .................................................... 5, 6

*SEC. v. Hardy*,
  803 F.2d 1034 (9th Cir. 1986) ........................................................ 5

*United States v. Arizona Fuels Corp.*,
  739 F.2d 455 (9th Cir. 1984) ........................................................ 7, 8

*Zacarias v. Stanford Int'l Bank, Ltd.*,
  945 F.3d 883 (5th Cir. 2019) .................................................... 4, 5, 6

STATUTES

28 U.S.C. § 2283 ............................................................................ 5

RULES

Fed. R. App. P. 28(a)(8)(A) ........................................................... 1

**OTHER AUTHORITIES**

John Ritchie, Reports of Cases Decided by Francis Bacon
 (London 1932) ..................................................................................2
Joseph Story, Commentaries on Equity Jurisprudence
 (4th ed. 1846) ..................................................................................3

Appellees Chicago Title Company and Chicago Title Insurance Company ("Chicago Title") submit this Sur-Reply to address Appellant Kim Peterson's Reply Brief arguments concerning (1) "traditional equity," (2) non-consensual, uncompensated releases, and (3) due process and the Seventh Amendment.

### 1. Peterson forfeited his "traditional equity" argument, which also fails on the merits.

At the outset, Peterson failed to raise this argument in the district court below, even though the Supreme Court decided *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)—the case on which the argument is based—more than a quarter century ago. It is therefore forfeited. *AlohaCare v. Hawaii, Dep't of Human Servs.*, 572 F.3d 740, 745 (9th Cir. 2009). Peterson also forfeited the argument by failing to develop it adequately when raising it for the first time in his Reply Brief, which contains no analysis, in violation of FRAP 28(a)(8)(A). *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1047 & n.3 (9th Cir. 2020); *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

Should this Court reach the argument's merits, Peterson contends the Bar Order is impermissible because it is "not a remedy traditionally awarded by courts of equity." ARB 27 (citing *Grupo*). He is wrong.

*Grupo* evaluates whether remedies issued by a court of equity are "traditional" by analyzing whether they were available at the time of the nation's founding, particularly in the English Court of Chancery. 527 U.S. at 322-23. Orders like the Bar Order were indeed available at Chancery, where equity permitted injunctions of lawsuits against third parties when necessary to resolve myriad overlapping claims.

For example, in 1619's *Tiffin v. Hart*, the Court of Chancery weighed the detailed interests of each creditor in a deceased's estate to settle all claims equitably in a single proceeding. John Ritchie, Reports of Cases Decided by Francis Bacon 161, 161-62 (London 1932) (addendum A).[1] After doing so, it enjoined all other suits involving the estate's assets—including the dissenting creditors' pending actions against the decedents' third-party sureties. *Id.*

Similarly, in *Brooke v. Goode*, also decided in 1619, a debtor sought to delay his creditors from seizing his property for four years so he could pay off his debts. *Id.* at 191-192 (addendum B). The Court of Chancery found for the debtor in the interests of equity—and enjoined the dissenters from enforcing their claims against third-party guarantors.

---

[1] Authorities not easily accessible are attached.

2

*Id.*; *see also* Joseph Story, Commentaries on Equity Jurisprudence, 607 (§ 549) (4th ed. 1846) (addendum C) (discussing enjoining dissenting creditors from initiating lawsuits or "proceeding in any suits already commenced").

The Bar Order is no different from the injunctions in *Tiffin* and *Brooke*. To accomplish equity, the Receiver maximized the Settlement and allocated it in a single proceeding based on each claimant's entitlement. That required the district court to enjoin lawsuits by the sole dissenter, Peterson, against an allegedly liable third-party, Chicago Title. Doing so was a "traditional" equitable remedy.[2]

Peterson provides no contrary historical authority. He cites only— without any analysis—the Sixth Circuit's decision in *Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772 (6th Cir. 2023). ARB 28-30.

In *Digital Media*, the Sixth Circuit reversed entry of a bar order. Critically, the plaintiffs' claims were independent, non-derivative claims, seeking compensation for fundamentally different harms than the

---

[2] Notably, traditional equitable remedies in an equitable receivership have nothing to do with the United States Bankruptcy Code, a creature entirely of statute, that governs bankruptcy cases (like *Harrington v. Purdue Pharma L.P.*, 603 U.S. __, 144 S. Ct. 2071, 2088 (2024).)

3

receiver. 59 F.4th at 784 ("[T]he Art Students' injuries (reduced job prospects, among other harms) have little in common with Dream Center's injury (its insolvency)").

Here, in contrast, the district court found Peterson's claims were derivative of and dependent on the Receiver's, seeking damages for the same harm allegedly caused by the same involvement of Chicago Title's escrow accounts in the Ponzi scheme. 1-ER-11-16; *compare* 9 ER 2251-2371 (Peterson's complaint) *with* 10 ER 2492-2535 (Receiver's). That difference is outcome-determinative: The central reason *Digital Media* reversed is that the Art Students' claims were totally different from the receivership's claims. In this case, they are fundamentally the same. (*Digital Medial* also did not identify the historical authorities discussed above.)

Thus, *Digital Media*'s inquiry into "ownership" of unrelated claims is irrelevant here. Peterson's overlapping claims threaten the Receiver's ability to protect the *res* for the benefit of all victims suffering the same harms. As explained in *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 887-902 (5th Cir. 2019), and *SEC v. DeYoung*, 850 F.3d 1172, 1180-

1183 (10th Cir. 2017), jointly and equitably resolving all similar claims is the very purpose of an equitable receivership. *See* AAB 52-57.

In any event, neither *Digital Media* nor Peterson considered the effect of the Anti-Injunction Act, 28 U.S.C. § 2283, on a *Grupo* analysis. *Grupo* held that an Act of Congress may authorize equitable remedies beyond their traditional scope. 527 U.S. at 322, 329, 333. The "aid of jurisdiction" exception to the Anti-Injunction Act, added in 1948, allows a district court to grant an injunction "where 'a state proceeding threatens to dispose of property that forms the basis for federal in rem jurisdiction.'" *Zacarias*, 945 F.3d at 902-03.

The district court found that Peterson's derivative state court claims would have blocked the Settlement and threatened Receivership assets. 1-ER-11-16. A district court's jurisdiction when overseeing an equitable receivership includes "orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC. v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986). To the extent an injunction is necessary to aid that jurisdiction, it is authorized by the Act's 1948 amendments. Thus, the Bar Order is valid under *Grupo* even if it is not "traditional." 527 U.S. at 329; AAB 67-72.

Accordingly, Peterson's "traditional equity" argument fails.

### 2. Peterson forfeited his argument concerning "nonconsensual, uncompensated releases," which likewise fails.

Peterson failed to raise his argument that an equitable receiver cannot enforce "nonconsensual, uncompensated releases" in the district court, thereby forfeiting it; indeed, Peterson *conceded* the legal validity of such releases in his Opening Brief. AOB 12-14, 16 (arguing nonconsensual, uncompensated releases are within an equity court's discretion). Only in Reply does he contend they are impermissible.

On the merits, Peterson's argument is similar to his "traditional equity" argument and fails for similar reasons. Both *Zacarias* and *DeYoung* held derivative claims that seek the same relief for the same harm as claims brought by a receiver—as the district court found Peterson's do here—may be settled and released by the receiver without consent. AAB 52-57; 945 F.3d at 887-902; 850 F.3d at 1180-1183.

Peterson seeks to distinguish *Zacarias* and *DeYoung* solely on the ground that in those cases, the party enjoined participated in the receivership's distributions. ARB 30-31. But Peterson's claims were considered for distributions like every other party—they were just

6

disallowed because Peterson was a central participant in the Ponzi scheme and caused hundreds of millions of dollars in losses for genuine victims, while earning millions for himself. AAB 23-26. Moreover, the Settlement gave Peterson substantial compensation: Chicago Title's release of $100 million of its claims against him and the satisfaction of virtually all claims other parties could have brought against him. *Id*.

Thus, Peterson's "nonconsensual, uncompensated releases" argument fails.

### 3. Peterson's due process and Seventh Amendment arguments are forfeited and fail.

Neither in his Opening Brief, nor in the district court below, did Peterson mention "due process" or the "Seventh Amendment." These arguments are defective anyway. Peterson contends that he cannot be deprived of a "property right"—his state law claims—but other than citing general propositions that a claim is a property right, he cites nothing to support his contention that his "insider" and "net-winner" status cannot be resolved using summary procedures. ARB 33-37. To the contrary, Peterson filed a proof of claim in the Receivership action, voluntarily submitting to the court's equity jurisdiction. *United States v. Arizona Fuels Corp.*, 739 F.2d 455, 458 (9th Cir. 1984) ("[S]ummary

7

proceedings are appropriate and proper to protect equity receivership assets.").

His Seventh Amendment argument is frivolous. *Id.* at 460 ("No right to jury trial attaches to equitable proceedings in the administration of a receivership").

## CONCLUSION

For these reasons, all of Peterson's new arguments are forfeited, and all fail on the merits.

Respectfully Submitted,

By: <u>s/ *Ben Feuer*</u>
        Ben Feuer
        Rex S. Heinke
        Johanna S. Schiavoni
        Jessica M. Weisel
    Complex Appellate Litigation Group LLP

        Steven A. Goldfarb
    Hahn Loeser & Parks LLP

        Steven M. Strauss
        Megan Donohue
    Cooley LLP

    *Attorneys for Defendants-Appellees*
    *Chicago Title Company &*
    *Chicago Title Insurance Company*

## CERTIFICATE OF COMPLIANCE

The text of this brief contains 1,400 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that that this brief complies with this Court's July 25, 2024 order ("Appellees Chicago Title Company and Chicago Title Insurance Company may file a sur-reply brief, limited to five pages") and the word limit of Cir. R. 32-3 ("the word count divided by 280 does not exceed the designated page limit").


By:  s/ *Ben Feuer*                        August 2, 2024

# ADDENDUM OF STATUTORY CITATIONS

**28 U.S.C. § 2283**

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

# ADDENDUM A

## TIFFIN AND OTHERS *v.* HART (LADY) AND OTHERS.

VERULAM, L.C.

1618, 1619.

Tothill, 113 (*sub nom. Tiffin* v. *Tiffin*).

*Insolvency—Compromise—Composition—Dissenting creditors — Chancery proceedings against — Injunction to stay actions at law—Decree to enforce consent to composition— Excepted debts—Advances of orphans' money—Advances free of interest.*

*An insolvent debtor died leaving debts almost all of which were secured by bonds in which his two sons were bound as his sureties. There were eighty creditors and the total debts were upwards of £9,800. The sons made a proposal that they should hand over to the creditors the whole of their father's and their own estates amounting altogether to about £5,500 to be applied as far as they would go towards payment of the debts, and that the creditors should accept a proportionate composition in full discharge of their debts. An agreement embodying the proposal was signed by fifty-five of the creditors who were entitled to more than three-fourths of the debts. The other twenty-five creditors who were entitled to less than one-fourth of the debts refused to sign the agreement and brought actions at common law for their debts. Some of the debts owing to the dissenting creditors were for advances of money held in trust for orphans, and some were for money lent free of interest. In Chancery proceedings by the sons of the insolvent and the consenting creditors against the dissenting creditors:*

*Held, that an injunction should be granted to restrain the dissenting creditors' actions at law.*

*Held, further, that all the dissenting creditors, as well as the consenting creditors, should be bound by the agreement to accept the composition, and should on payment thereof deliver up to the plaintiffs their bonds to be cancelled ; except those of them who had advanced orphans' money or money free of interest, who should be paid the principal of their debts in full by specified instalments.*

One Robert Tiffin died leaving debts owing to eighty creditors which amounted to not far short of twice the value of his estate real and personal. Almost all the debts were secured by bonds on all of which his two sons Thomas and John Tiffin were bound as his sureties, and on some of which other persons also were bound. Many of the creditors brought

B.R.                                                                            II

162 TIFFIN AND OTHERS *v.* HART (LADY) AND OTHERS.

actions at common law for their debts, and the sureties were threatened with imprisonment. In these circumstances Thomas and John Tiffin made an offer to the creditors that they should not only disclose the whole of their father's estate but should also subject the whole of their own estates even to their very clothes to satisfy the creditors rateably so far as the same would go. The offer not being accepted, the Tiffins presented a petition to His Majesty the King praying that the creditors might be caused to accept their offer, and His Majesty referred the matter to a committee of four persons one of whom was Sir John Suckling.[1] At the suggestion of the committee, the majority of the creditors to the then number of fifty-four signed an agreement in writing to accept such proportion of their several debts as the whole estate of the Tiffins, father and sons, would amount to, excepting certain household effects and other property to be retained by the Tiffins, and that the Tiffins and other sureties on paying the agreed composition should be discharged. The committee assisted by ten of the conformable creditors acting with the consent of all of them examined and dealt with the matter, and certificates were made by which it appeared that the total debts were of a certain amount (increased in the report mentioned below to a little over £9,800), and that the total estates of all the Tiffins not more than £5,519 odd ; that the Tiffins had conveyed all their estates to the use of the creditors; and that less than one-third of the creditors refused to stand to the agreement whose total debts were of far less value than those of the conformable creditors.

Early in 1618 a formal suit in Chancery was instituted by the Tiffins and the conformable creditors against the unconformable creditors, and in Trinity term 1618 Verulam, L.C.,

*Ordered* that the creditors' actions at law should be stayed by injunction pending the making of such order in the cause as was fit.

On November 6, 1618, in view of the refusal of the unconformable creditors to sign the agreement, the Tiffins and the conformable creditors presented a second petition to His Majesty, who referred it to the Lord Chancellor.

---

[1] He became controller of the royal household, and was the father of the poet of the same name.

.

TIFFIN AND OTHERS *v.* HART (LADY) AND OTHERS.  163

On December 12, 1618, the cause came before his Lordship, when it appeared (*inter alia*) that several of the debts of both classes of creditors were for advances of money held in trust for orphans or poor children, and that the debts of the conformable creditors were more than three times as great as those of the unconformable creditors; and his Lordship thereupon ordered that all the creditors of both classes should respectively make two several schedules of their debts, showing each debt, the nature thereof, the security therefor, the time of lending and for discharging it, and the reasons why a composition should or should not be accepted in respect of it, and that all the creditors and the Tiffins were to attend Master Thellwall and Sergeant Finch with the schedules, who were to prepare the matter for his Lordship's further hearing, and thereupon he would make a final order in the cause; and he again directed that the creditors' actions at law should be stayed.

From the report made by Sergeant Finch and Master Thellwall it appeared that schedules had been duly produced to them as directed, that the debts of the conformable creditors now fifty-five in number amounted to £7,528, that all these debts (except five for £400) were for money disbursed and secured by bonds, that in three of these bonds one Cleeve and others as well as the Tiffins were sureties, that two of the bonds were for money representing legacies to orphans, that there was an obligation for an annuity, two statutes merchant, and two mortgages; that the debts of the unconformable creditors, the defendants, twenty-five in number, amounted to £2,330 and were due only by bonds, that some of them were for orphans' money, that six of these bonds in which Cleeve was surety were for money lent free of interest, that two others in which Clearke and others with the Tiffins were sureties were for money similarly lent, and that the twenty-five defendants still refused to sign the agreement and relied upon their securities.

On April 20, 1619, the cause again came on for hearing, and his Lordship, well weighing the nature of this cause and the honest dispositions of the Tiffins and their filial respect and piety to their dead father, finds good cause to single this cause from the ordinary causes of bankrupts and to give the Tiffins and their conformable creditors relief: Yet with this,

164  TIFFIN AND OTHERS *v.* HART (LADY) AND OTHERS.

that there be a distinction of the nature and quality of the persons, vizt. those that are trusted on behalf of others being orphans to have good security for their money, the surety being always in the eye of the lender, and to that purpose his Lordship will take some short time to look upon the said schedules and give his final order therein; But as to the rest of the unconformable creditors and also the conformable creditors it is

*Ordered* and *Decreed* that they shall accept of their moneys according to the aforesaid composition and agreement; but for those unconformable creditors who had the said Cleeve and Clearke for sureties his Lordship doth respite his order and decree for them till he shall have further considered of the said schedules, but with this his Lordship declared in general that if there were any amongst the unconformable creditors that had not set out their moneys to Tiffin the father upon interest he should be exempted out and clearly freed from his decree and not be bound thereby; and that all the said creditors who are bound by this present order shall, upon payment of their moneys according to the said agreement, severally and respectively deliver up to the Tiffins to be cancelled all such bonds, bills and other securities which they respectively have of or concerning the said debts or any of them.

On May 11, 1619, his Lordship, having duly considered of the said schedules,

*Ordered* and *Decreed* that as to all those of the unconformable creditors who have the said Cleeve and Clearke for their security, and those also of the unconformable creditors whose money is *bona fide* the money of orphans and so was at the time of lending thereof, that all such shall have their principal debt only due unto them upon the specialties satisfied and paid unto them within two years from the date of this present decree by six months' equal portions ; and that the plaintiffs performing the aforesaid payments shall and may have all the goods household stuff and debts mentioned in the agreement, and the same agreement to be ratified and confirmed in all other points thereof.

*References.*

ORDERS OF COURT : Chancery Orders, Lib. 1618A, fol. 111, 115, 159, 301, 417, 698, 979, 997.

A-6

# ADDENDUM B

## BROOKE (*or* LITTLE) AND OTHERS *v.* GOODE AND OTHERS.

VERULAM, L.C.

1619.

Tothill, 181.

*Insolvency—Compromise—Proposal to give time—Consent of majority of creditors—Refusal of other creditors—Commission of bankruptcy—Stay of actions against debtor and sureties.*

*The majority of the creditors of an insolvent debtor consented to give him time for four years for payment of his debts, but his other creditors refused to consent, and brought actions at law for their debts against him and his sureties. The debtor and the consenting creditors took proceedings in Chancery against the other creditors for relief. A commission of bankruptcy was issued, and the commissioners certified that unless all the creditors would give the debtor the time aforesaid none of them would get satisfaction. Held, that four years should be given to the debtor to pay his debts to all his creditors, and that in the meantime the actions brought by the defendants should be stayed not only as against the debtor but also as against his sureties.*

Francis Brooke or Little, having long resided in Abingdon in Berkshire, had acquired property there consisting of houses and land, and in recognition of good service rendered by him to the town had been four times appointed its mayor. His estate became decayed, not by any bad courses of his own, but owing to law suits unjustly brought against him, bad debts, charge of children, and dishonest servants, and he was no longer able to pay his debts. Some of his debts were secured by bonds, in several of which he was bound alone and in others of which sureties were bound in his behalf. Most of his creditors agreed to grant him four years' forbearance for payment of his debts. Some of them, however, refused to do so, and took or threatened to take proceedings at law against him and his sureties for their debts. In 1618 the debtor and the consenting creditors accord-

192 BROOKE (*or* LITTLE) AND OTHERS *v.* GOODE AND OTHERS.

ingly filed a bill in Chancery against these uncompromising creditors for relief; but, owing to cause not being shown to the contrary pursuant to an order of the Court, that bill was dismissed.

Thereupon the debtor, supported by more than forty of his consenting creditors, presented a petition to the King as the head of the Court of Chancery for relief, and His Majesty referred the matter to a commission in the nature of a commission of bankruptcy, appointing as commissioners the Bishop of London and three other persons. These commissioners made a certificate by which it appeared that the debtor did not crave any mitigation of the amount of his debts, but only four years' time in which to pay them; that more than forty of the creditors consented to give him that time, but that the others absolutely declined to do so; and that, unless all the creditors would agree to give him that time, there was no hope that any of them would be satisfied.

In May 1619 the debtor and forty-four of his compassionate creditors accordingly exhibited a new bill against the refractory creditors, ten in number, claiming the four years' time which the debtor desired, and an injunction to restrain the defendants from proceeding against him at common law in the meantime. On September 22, 1619, a motion was made on behalf of the defendants to dismiss that bill, but on a satisfactory explanation being given on behalf of the plaintiffs why cause had not been shown against the dismissal of the former bill, Verulam, L.C., appointed a day in the next term to hear counsel on both sides.

On November 23, 1619, on the hearing of the cause and the reading of the certificate of the commissioners, his Lordship

*Ordered* that four years be given to the debtor to pay all the debts due to the wilful and refractory creditors without any further security to be given to them, which the charitable creditors had yielded to, and that in the meantime an injunction be awarded against all the refractory creditors for stay of all their proceedings at the common law as well against the debtor himself, but also against any of his sureties, his, their or any of their lands, goods, or chattels.

*References.*

ORDERS OF COURT: Chancery Orders, Lib. 1617A, fol. 1341; Lib. 1618A, fol. 39, 77, 186, 1384; Lib. 1619A, fol. 528, 813.

# ADDENDUM C

§ 549. As soon as the decree to account is made in such a suit, brought in behalf of all the creditors, and not before, the executor or administrator is entitled to an injunction out of Chancery, to prevent any of the creditors from suing ·him at law, or proceeding in any suits already commenced, except under the direction and control of the Court of Equity, where the decree is passed.[1] The object of the Court, under such circumstances, is to compel all the creditors to come in and prove their debts before the Master; and to have the proper payments and discharges made under the authority of the Court; so that the executor or administrator may not be harassed by multiplicity of suits, or a race of diligence be encouraged between

even when the suit had proceeded to a considerable extent. If then the Court would compel a creditor to accept payment of his debt when the executor offers to pay it, with the costs of suit, where is the line to be drawn, beyond which the plaintiff cannot be allowed to have the exclusive benefit of his own suit. I am satisfied that in this case there ought to be a decree for immediate payment. It was objected, however, that in Sterndale v. Hankinson, Sir A. Hart said, that, on the filing of a creditors' bill, every creditor has an inchoate right in the suit; the meaning of that expression is, that a right then commences which may indeed fail, but may also be perfected by decree; and it is not inaccurately called an inchoate right. After the decree, every creditor has an interest in the suit; but the question is, whether the plaintiff, until decree, is not *dominus litis*, so that he may deal with the suit as he pleases. There is nothing to prevent other creditors from filing bills for a like purpose; and there is nothing more common than for several suits to exist together, and the Court permits them to go on together until a decree in one of them is obtained, because it is possible, before the decree, that the litigating creditor may stop his suit.

[1] Morrice v. Bank of England, Cas. Temp. Talb. 217; Martin v. Martin, 1 Ves. 211, 212; Perry v. Phelips, 10 Ves. 38, 39; Brooks v. Reynolds, 1 Bro. Ch. R. 183, and Mr. Belt's note; Douglas v. Clay, 1 Dick. R. 393; Kenyon v. Worthington, 2 Dick. R. 668; Paxton v. Douglas, 8 Ves. 520; Jackson v. Leap, 1 Jac. &. Walk. 231, and note; McKay v. Green, 3 John. Ch. 58; Burles v. Popplewell, 10 Sim. R. 383. See Underwood v. Hatton, 5 Beav. R. 31

different creditors, each striving for an undue mastery and preference.[1] And this action of the Court presupposes, that all the legal rights of every creditor and the validity of his debt may be, and, indeed, must be, · determined in Equity, upon the same principles as it would be at Law.[2] But, in order to prevent any

[1] Jeremy on Eq. Jurisd. B. 3, Pt. 2. ch. 5, p. 538 to 543.

[2] Whitaker v. Wright, 2 Hare, R. 310. On this occasion Mr. Vice-Chancellor Wigram said; " With respect to the form of a decree in a creditors' suit,— the Court does not treat the decree as conclusive proof of the debt. It is clear, that it is not so treated for all purposes; for any other creditor may challenge the debt, Owens v. Dickenson (1 Cr. & Ph. 48); and it is equally clear, that, in practice, the executor himself is allowed to impeach it. If, in a case where the plaintiff sues on behalf of himself and all the other creditors, and the defendants, who represent the estate, do not admit assets, (see Woodgate v. Field,) it is objected, at the hearing, that the debt is not well proved,— the Court tries the question only whether there is sufficient proof upon which to found a decree; and, however clearly the debt may be proved in the cause, the decree decides nothing more than that the debt is sufficiently proved to entitle the plaintiff to go into the Master's office; and a new case may be made in the Master's office, and new evidence may be there tendered. The real question is, in what way the new case is to be tried, or what is the course to be pursued in the Master's office? The plaintiff says that the course should be the same as at law, and that he brings his legal rights with him into equity; and, subject to some qualification, I cannot refuse my assent to the plaintiff's proposition. When a decree is made in a creditors' suit, under which all the creditors may come in, this Court will not permit the estate to be embarrassed by proceedings which might conflict with each other, to the prejudice of the executor or administrator, Perry v. Phelips (10 Ves. 34); but nothing would be more unjust than that the Court should restrain the creditor from proceeding to enforce his rights at law, except upon the principle of allowing him to bring his legal rights with him into the office of the Court, which it substitutes for the proceedings at law, Dornford v. Dornford (12 Ves. 127); Berrington v. Evans (1 You. 276); and the circumstance, that the creditor is also the plaintiff in the suit in equity, makes no difference in that respect. The only qualifications which now occur to me of the general rule, that a legal creditor brings all his legal rights with him, are founded, first, upon the circumstance, that, in certain special cases, a court of equity, in the ordinary course of administering assets, will distinguish a voluntary bond from one given for value, Lady Cox's case (3 P. Wms. 339);