**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| U.S. SECURITIES & EXCHANGE COMMISSION, | No. 22-56206 |
| *Plaintiff-Appellee*, | D.C. No. 3:19-cv-01628-LAB-AHG |
| v. | |
| KIM H. PETERSON, individually, and as Trustee of the Peterson Family Trust dated April 14, 1992, and as Trustee of the Peterson Family Trust dated September 29, 1983; KIM FUNDING, LLC; ABC FUNDING STRATEGIES, LLC; ABC FUNDING STRATEGIES MGMT., LLC; KIM MEDIA, LLC; KIM MANAGEMENT, INC.; KIM AVIATION, LLC; AERO DRIVE, LLC; AERO DRIVE THREE, LLC; BALTIMORE DRIVE, LLC; GEORGE PALMER CORPORATION; KIM FUNDING LLC DEFINED BENEFIT PENSION PLAN; ANI LICENSE FUND, LLC; LAURIE PETERSON, | OPINION |
| *Appellants*, | |

v.

CHICAGO TITLE COMPANY;
CHICAGO TITLE INSURANCE
COMPANY,

      *Defendants-Appellees*,

NOSSAMAN LLP; MARCO
COSTALES,

      *Real-party-in-interest-
Appellees*,

-------------------------------

KRISTA FREITAG, Receiver for ANI
Development, LLC, American
National Investments, Inc., and their
subsidiaries and affiliates,

      *Receiver-Appellee*.

---

U.S. SECURITIES & EXCHANGE
COMMISSION,

      *Plaintiff-Appellee*,

v.

OVATION FUND MANAGEMENT

No. 22-56208

D.C. No.
3:19-cv-01628-
LAB-AHG

II, LLC,

     *Objector-Appellant*,

  v.

CHICAGO TITLE COMPANY;
CHICAGO TITLE INSURANCE
COMPANY,

     *Defendants-Appellees*,

NOSSAMAN LLP; MARCO
COSTALES,

     *Real-party-in-interest-
     Appellees*,

------------------------------

KRISTA FREITAG, Receiver for ANI
Development, LLC, American
National Investments, Inc., and their
subsidiaries and affiliates,

     *Receiver-Appellee*.

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted August 13, 2024
Pasadena, California

Filed February 20, 2025

Before:  David M. Ebel,[*] Bridget S. Bade, and Danielle J.
Forrest, Circuit Judges.

Opinion by Judge Ebel

## SUMMARY[**]

### District Court Bar Orders

The panel affirmed the district court's orders, issued as part of a global settlement, barring all ongoing and future litigation against Chicago Title Company and the Nossaman law firm stemming from a Ponzi scheme operated by Gina Champion-Cain.

Gina Champion-Cain operated a Ponzi scheme through her company ANI Development, LLC. The Securities and Exchange Commission ("SEC") brought this civil enforcement action freezing Cain's and ANI's assets, appointing a receiver for ANI, and temporarily staying litigation against ANI. Temporarily unable to seek recovery for their losses from ANI, defrauded investors instead sued third parties—including Chicago Title and Nossaman. As part of a global settlement, the district court barred litigation against Chicago Title and Nossaman stemming from the

---

[*] The Honorable David M. Ebel, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Ponzi scheme. Parties whose ongoing state-court litigation against Chicago Title and Nossaman was extinguished challenged the bar orders. Appellant Kim Peterson challenged the Chicago Title bar order, while Appellant Ovation Fund Management II, LLC challenged the Nossaman bar order.

The panel rejected Appellants' contentions that the district court had no authority to enter the bar orders and that the Anti-Injunction Act precluded those orders. A district court overseeing an SEC enforcement action has wide discretion to determine the appropriate relief in an equity receivership. The panel held that Appellants' barred claims substantially overlapped with the Receiver's claims and that barring Appellants' claims was necessary to preserve the ANI receivership estate. The panel also rejected Peterson's argument that, as a matter of equity, entering the Chicago Title bar order was unfair to him. Accordingly, the panel concluded that the district court had authority to enter both bar orders, and upheld the orders.

---

## COUNSEL

Gary Y. Leung Jr., Regional Trial Counsel, United States Securities and Exchange Commission, Los Angeles Regional Office, Los Angeles, California; Kathrin Wanner, Miller Wanner LLP, Los Angeles, California; Morgan E. A. Bradylyons, United States Securities & Exchange Commission, Washington, D.C.; for Plaintiff-Appellee.

Frederic D. Cohen (argued) and Curt Cutting, Horvitz & Levy LLP, Burbank, California; Daniel N. Csillag and Paul

D. Murphy, Murphy Rosen LLP, Santa Monica, California; for Objector-Appellant.

Rupa G. Singh (argued), Niddrie Addams Fuller Singh LLP, San Diego, California; Seanna R. Brown, Baker & Hostetler LLP, New York, New York; Miles D. Grant, Grant & Kessler APC, San Diego, California; Philip C. Tencer, Tencer Sherman LLP, San Diego, California; for Appellants.

Rex S. Heinke (argued) and Jessica M. Weisel, Complex Appellate Litigation Group LLP, Los Angeles, California; Ben Feuer, Complex Appellate Litigation Group LLP, San Francisco, California; Johanna S. Schiavoni, Complex Appellate Litigation Group LLP, San Diego, California; Mazda Antia, Steven M. Strauss, and Megan Donohue, Cooley LLP, San Diego, California; Steven A. Goldfarb, Hahn Loeser & Parks LLP, San Diego, California; for Defendants-Appellees.

Hannah M. Chartoff (argued) and Lisa Ells, Rosen Bien Galvan & Grunfeld LLP, San Francisco, California; Earll M. Pott and Heather L. Rosing, Rosing Pott & Strohbehn, San Diego, California; Tara Burd, Klinedinst PC, San Diego, California; for Real-parties-in-interest-Appellees.

Edward G. Fates (argued), Allen Matkins Leck Gamble Mallory & Natsis LLP, San Diego, California; Michael R. Farrell, David R. Zaro, and Matthew D. Pham, Allen Matkins Leck Gamble Mallory & Natsis LLP, Los Angeles, California; Tyler R. Dowdall, Tarter Krinsky & Drogin LLP, Los Angeles, California; for Receiver-Appellee.

## OPINION

EBEL, Circuit Judge:

Gina Champion-Cain ("Cain") operated a Ponzi scheme through her company ANI Development, LLC ("ANI"). Over eight years' time, more than 400 investors paid approximately $389 million into Cain's fraudulent scheme. When the scheme unraveled, the Securities and Exchange Commission ("SEC") brought this civil enforcement action, froze Cain's and ANI's assets, appointed a receiver for ANI ("Receiver"), and temporarily stayed litigation against ANI. Temporarily unable to seek recovery for their losses from ANI, defrauded investors instead sued several third parties— including Chicago Title Company ("Chicago Title") and attorney Marcos Costales and his Nossaman law firm (collectively "Nossaman")—in California state court, alleging that these third parties aided Cain's Ponzi scheme.

Eventually the district court authorized the Receiver and Chicago Title to sue each other. That led to a global settlement between primarily the Receiver and Chicago Title. As part of that global settlement, the district court barred all ongoing and future litigation against Chicago Title and Nossaman stemming from the Ponzi scheme. In these two appeals, parties whose ongoing state-court litigation against Chicago Title and Nossaman was thus extinguished challenge those bar orders. Specifically, Kim Peterson and related entities (collectively "Peterson") challenge the Chicago Title bar order, while Ovation Fund Management II, LLC ("Ovation") challenges the Nossaman bar order. Having jurisdiction under 28 U.S.C. § 1292(a)(1), see Smith v. Arthur Andersen LLP, 421 F.3d 989, 994–95, 997 (9th Cir. 2005), we AFFIRM both bar orders.

# I. BACKGROUND[1]

## A. Cain's fraudulent investment scheme

Cain's scheme involved fraudulent investments purportedly based on California liquor license transfers. California law requires an applicant seeking to purchase an existing liquor license to place an amount equal to the purchase price in escrow while the State's Department of Alcohol Beverage Control ("ABC") considers the application.[2] In actuality, ABC rarely enforces this requirement.

Cain, nonetheless, falsely represented to potential investors that liquor license applicants often did not want to tie up their own funds in escrow while waiting for the State to process their license applications and were willing to pay high interest rates (generally 15% to 25%) for short-term loans to fund the State-required escrow accounts. Cain purportedly offered her investors a platform by which they could make liquor license applicants these short-term, high-interest loans. Cain provided her investors a list of liquor license applicants purportedly seeking loans and the loan amount that each applicant needed; investors would choose an applicant and deposit the needed loan amount into what inventors thought was an escrow account held by Chicago Title and designated for the particular applicant the investor had chosen; after the State ruled on the liquor license application, the money in escrow was to be returned

---

[1] These underlying facts are generally undisputed and are based primarily on admissions Cain made in her criminal prosecution when she pled guilty to securities fraud and allegations the SEC made in this civil enforcement action, which Cain conceded were true.

[2] See Cal. Bus. & Prof. Code §§ 24074–24074.3. See generally id. D. 9, Ch. 6, Art. 5.

to the investor; the loan applicant would purportedly pay interest on the loan for the time that the loan was held in the escrow account for the applicant's benefit; and ANI and the investor would share that interest, with 20% going to ANI and 80% to the investor.

One of the things investors found particularly appealing about Cain's investment scheme, as she explained it, was that their money would purportedly always remain safely in the escrow accounts. Cain told investors, and investors signed contracts with ANI and/or Chicago Title indicating, that although the amount of a liquor license loan would be placed in an escrow account at Chicago Title designated for a specific liquor license applicant, the investor making the loan would continue to own that escrowed money, which could not be used for any other purpose, could not be transferred, and could be returned only to the investor.

Contrary to what Cain told her investors, however, there were no liquor license applicants needing loans. Nor were there any escrow accounts. Cain instead directed investor funds into a single holding account at Chicago Title to which Cain had unfettered access. She used those funds to support her living expenses, fund her other business ventures, and repay earlier investors in the liquor license scheme.

To facilitate her fraudulent scheme, Cain bribed several Chicago Title employees—including a vice president and three escrow officers in the company's San Diego office—to provide Cain's investors with forged paperwork and false documentation indicating that the investors' funds had been placed safely in escrow accounts designated for specific (fictitious) liquor license applicants. These Chicago Title employees knew that Cain and her ANI employees were also forging escrow documents and falsifying other information

given to investors. The bribed Chicago Title employees would cover for Cain when her investors, or their auditors, sought to verify that the invested money was being safely held in escrow accounts.

In addition to the bribed Chicago Title employees, several others aided Cain in operating her Ponzi scheme. Kim Peterson, a San Diego land developer and Cain's friend, was an early investor in the scheme. Pleased with the return he received on his initial investment, Peterson continued to invest in the scheme. In addition, he created several businesses, including Kim Funding and ABC Funding (together, the "funding entities"), to raise additional funds for Cain's scheme by recruiting other investors. In return, ANI paid Peterson's funding entities 80% of the interest that ANI purportedly received on each of the fictitious liquor license loans made by Peterson-recruited investors. Cain also made Kim Funding a 1% equity owner and 50% voting member in ANI.[3]

To aid his recruiting efforts, Peterson retained attorney Marco Costales, a partner in the Nossaman law firm. Costales, purportedly a liquor licensing expert, represented to several potential investors being recruited by Peterson that Costales had vetted Cain's liquor license investment scheme and "could find no structural deficiencies . . . from an ABC perspective" and that he "was hard pressed to think of a situation where" invested funds placed "in the escrow could be lost." In actuality, Costales had not investigated the

---

[3] Peterson asserts that he never knew that Cain's investment scheme was fraudulent. This issue is currently being litigated in a suit not related to these appeals.

liquor license scheme at all and merely passed along unverified information that Peterson gave him.

## B. The fraud unraveled

When the Ponzi scheme unraveled in 2019, the SEC initiated this civil enforcement action against Cain and ANI, alleging that the fraudulent "investments" Cain offered through ANI were "securities" and that, in offering those fraudulent securities, the defendants violated the Securities Act of 1933 and the Securities Exchange Act of 1934.[4] The district court froze Cain's and ANI's assets and appointed a receiver over ANI and ANI's parent company, American National Investment.[5] The court ordered the Receiver to take control of ANI; to collect ANI's assets, including pursuing any causes of action belonging to ANI; to make an accounting of ANI's financial condition and its assets; and to preserve those assets and prevent their dissipation, concealment, or disposition so that ANI's assets could be distributed to defrauded investors. The district court also temporarily stayed all litigation against ANI.

Temporarily unable to seek recovery from ANI, defrauded investors initiated litigation in California state court against several third parties, alleging those third parties had aided Cain's fraud. Chicago Title, with the deepest pockets, was the primary target. Peterson was among those

---

[4] In a separate criminal proceeding, Cain pled guilty to securities fraud and is currently serving a fifteen-year prison sentence.

[5] Cain ran the Ponzi scheme through ANI but transferred some funds derived from the scheme from ANI to American National Investment. Cain then used those funds to buy real estate and operate her other businesses. In a separate criminal proceeding, American National Investment's chief financial officer pled guilty to conspiracy related to the Ponzi scheme.

who sued Chicago Title. Some Peterson-recruited investors also sued Peterson and his funding entities and sued each other. In the investor suits against Chicago Title, Chicago Title counter- or cross-claimed against Peterson and Nossaman. Likewise, in the investor suits against Peterson, Peterson filed cross-claims against Chicago Title. Chicago Title settled many of the claims against it, paying $163 million to more than 300 defrauded investors who lost money in the Ponzi scheme.

While some of these state-court cases remained ongoing, the Receiver submitted her final accounting to the district court. Using the "money in, money out" ("MIMO") method, the Receiver calculated that 405 investors had paid $389 million into the Ponzi scheme. Of that number, 308 investors suffered net losses, which amounted to an aggregate net loss of $183 million. These net losses represented only the amount investors paid into the Ponzi scheme that was never recovered and did not include any other losses investors may have suffered, such as interest, lost profits, and attorney's fees. In contrast to the net losers, the Receiver determined that Peterson and his funding entities were net winners, earning over $12.7 million from the Ponzi scheme, which included purported investment returns and commissions for recruiting other investors. The district court approved the Receiver's calculations.[6]

After the Receiver's accounting, the district court permitted the Receiver to sue Chicago Title on ANI's behalf to recover, among other things, the amounts for which ANI

---

[6] Peterson, in another pending appeal, No. 23-55252, challenges the Receiver's determination that he and his funding entities are net Ponzi scheme winners and, thus, not entitled to participate in the ANI receivership distributions.

would be liable to its defrauded investors because of Chicago Title's complicity in the fraud.[7]  The district court authorized Chicago Title, in turn, to file counterclaims against ANI, seeking to recover the amounts Chicago Title had already expended to settle claims brought against it by Cain's defrauded investors.

The Receiver and Chicago Title ultimately reached a global settlement, which the district court approved.  The settlement called for Chicago Title to pay an additional $24 million to settle investors' claims.[8]  As a condition for the global settlement, the district court permanently barred any further litigation against either Chicago Title or Nossaman stemming from the Ponzi scheme.  In the interlocutory appeals at issue here, Peterson (in appeal No. 22-56206) challenges the Chicago Title bar order, while Ovation (in appeal No. 22-56208) challenges the Nossaman bar order.[9]

---

[7] Once a receiver is appointed for a business entity through which wrongdoers operated a Ponzi scheme, the business entity is itself considered a victim of the Ponzi scheme.  See Zacarias v. Stanford Int'l Bank, Ltd., 945 F.3d 883, 896 & nn.32–33 (5th Cir. 2019) (citing Scholes v. Lehmann, 56 F.3d 750, 754 (7th Cir. 1995)).  The business entity (here, ANI) is thus able to assert claims against the Ponzi scheme operators to recover from those alleged wrongdoers for the business entity's liability to its defrauded investors.  See id. at 896, 899.

[8] Chicago Title thus paid a total of $187 million, most of which went toward repaying defrauded investors' net investment losses of $183 million.

[9] The SEC enforcement action remains ongoing.  The Receiver continues to seek to recover money for the ANI receivership estate, including by pursuing several claw back actions.

## II. DISCUSSION

Appellants—Peterson and Ovation—contend that the district court had no authority to enter the bar orders and further contend that the Anti-Injunction Act ("AIA"), 28 U.S.C. § 2283, precludes those orders. We reject these arguments, concluding that Appellants' barred claims substantially overlapped with the Receiver's claims and that barring Appellants' claims was necessary to preserve the ANI receivership estate. Peterson also argues that, as a matter of equity, entering the Chicago Title bar order was unfair to him. We disagree, and we affirm both bar orders.

## A. A district court's general power to enter a bar order in an equitable receivership

A district court overseeing an SEC enforcement action has the equitable power to appoint a receiver over the entity through which the Ponzi scheme was operated. See SEC v. Wencke, 622 F.2d 1363, 1365, 1369 & nn.7–8 (9th Cir. 1980) (collecting cases). "Without a receiver, investors encounter a collective-action problem: each has the incentive to bring its own claims against the entity, hoping for full recovery; but if all investors take this course of action, latecomers will be left empty-handed." Zacarias, 945 F.3d at 895–96. "The receiver, standing in the shoes of the injured corporations, is entitled to pursue the corporation's claims 'for the benefit not of [the wrongdoers] but of innocent investors.'" Id. at 896 (alteration in original) (footnote omitted) (quoting Scholes, 56 F.3d at 754).

A district court overseeing the SEC enforcement action has "wide discretion to determine the appropriate relief in an equity receivership." SEC v. Hardy, 803 F.2d 1034, 1037 (9th Cir. 1986) (quoting SEC v. Lincoln Thrift Ass'n, 577 F.2d 600, 606 (9th Cir. 1978)). One way in which a district

court overseeing an equitable receivership may aid a receiver in gathering and distributing the receivership's assets equitably among defrauded investors is by issuing bar orders like the ones challenged here.[10]  "Of course, there are limits to a receivership court's power"—"the receivership court cannot reach claims that are independent" of the receivership "and that do not involve assets claimed by the receivership." Zacarias, 945 F.3d at 897.

## B. Appeal No. 22-56206: Peterson's challenge to the Chicago Title bar order

Peterson asserts that the district court had no authority to enter the Chicago Title bar order and that the AIA precludes it; he also argues that, even if the district court had authority to enter the bar order, it was inequitable to do so under these circumstances.  We reject each argument in turn.

### 1. The district court had authority to enter the Chicago Title bar order

As we explain next, we agree with the district court that it had authority to bar Peterson's claims against Chicago Title because 1) the Receiver's and Peterson's claims against Chicago Title substantially overlapped; and 2) the bar order was necessary to protect the ANI receivership's assets.[11]

---

[10] See, e.g., SEC v. Stanford Int'l Bank, Ltd., 112 F.4th 284, 291 (5th Cir. 2024); SEC v. Quiros, 966 F.3d 1195, 1197 (11th Cir. 2020); SEC v. DeYoung, 850 F.3d 1172, 1175, 1182–83 (10th Cir. 2017).

[11] The district court has in rem, or quasi-in-rem, jurisdiction over the property in the receivership res, including the receivership entity ANI's legal claims, and to resolve any pending claims to that res.  See Stanford Int'l Bank, 112 F.4th at 292; Digit. Media Sols., LLC v. S. Univ. of Ohio, LLC, 59 F.4th 772, 774, 778–79 (6th Cir. 2023); Zacarias, 945 F.3d at

> ### a. The Receiver's and Peterson's claims against Chicago Title substantially overlapped, both seeking to recover for the same losses stemming from the Ponzi scheme

The Receiver's and Peterson's claims against Chicago Title substantially overlapped because they both sought to recover from Chicago Title for the same losses stemming from the Ponzi scheme. The Receiver sought to recover from Chicago Title, among other damages, the amount for which the ANI receivership would be liable to all investors and others who lost money in the Ponzi scheme because of Chicago Title's conduct. Similarly, Peterson sought to recover from Chicago Title the amount of his alleged losses from the Ponzi scheme[12] because of Chicago Title's same conduct. The district court, therefore, had authority to bar Peterson's pending claims against Chicago Title in order to prevent that litigation from interfering with the Receiver's efforts to recover from Chicago Title for the same losses arising from the same fraudulent conduct. See Rotstain v. Mendez, 986 F.3d 931, 940–41 (5th Cir. 2021) (relying on Zacarias, 945 F.3d at 900–01); DeYoung, 850 F.3d at 1175–76 (upholding order barring investors' claims against a third party that stemmed "from the same loss, from the same entities, relating to the same conduct, and arising out of the

---

902–03. In addition, the Receiver has "standing" to assert claims on behalf of the receivership entity ANI for injuries to ANI. See DeYoung, 850 F.3d at 1181–82; Scholes, 56 F.3d at 753–54.

[12] The losses that Peterson seeks to recover from Chicago Title are not limited to his investment losses but also include losses that he allegedly suffered in recruiting other investors. However, all such losses are allegedly attributed to the Ponzi scheme.

same transactions and occurrences by the same actors" as the receiver's claims).

The Fifth Circuit's decision in Zacarias, in particular, is closely analogous to the situation presented here and supports our conclusion that the district court had authority to bar Peterson's claims against Chicago Title. Zacarias stemmed from a Ponzi-scheme involving fraudulent certificates of deposit ("CDs") issued by the Antigua-based Stanford Bank. 945 F.3d at 889–90. With the help of its insurance brokers, the Bank was able to give investors the false impression that the CDs were insured, when they were not. Id. Like Chicago Title's role in this case, the insurance brokers played a "key" and "central" role in the Stanford Bank Ponzi scheme by making the fraudulent investments appear safe to investors. Id. at 890. When that Ponzi scheme unraveled, a number of defrauded investors sought to recover their losses from the third-party insurance brokers. Id. at 893–94. The receiver for the Bank also sued the insurance brokers for their "participation in the [Ponzi] scheme." Id. at 900. As a part of a global settlement between the receiver and the insurance brokers, the district court permanently barred all claims against the brokers stemming from the Bank's Ponzi scheme. Id. at 894. The Fifth Circuit upheld that bar order, id. at 889, 894, 902, because the receiver was seeking to recover from the insurance brokers for the same losses as those claimed by the defrauded investors. This was so, notwithstanding that the receiver and the defrauded investors may have been asserting different legal theories, because the losses all ultimately stemmed from the Ponzi scheme. Id. at 898–900. Zacarias supports our conclusion here that the district court had authority to enter the Chicago Title bar order.

Contrast Zacarias with the Fifth Circuit's earlier decision in SEC v. Stanford International Bank, Ltd., 927 F.3d 830 (5th Cir. 2019), on which Peterson relies. That case, which stemmed from the same Stanford Bank Ponzi scheme, involved the Bank's professional liability insurance, which covered both the Bank and its officers, directors, and employees (collectively, "officers"). Id. at 836–37. That professional liability insurance was distinct from the Ponzi scheme. See id. When the Receiver sued the Bank officers for the harm their conduct during the Ponzi scheme caused the Bank, the officers sought coverage under the professional liability policies for the cost of their defense and indemnity for any liability the officers might incur. Id. at 837–39, 844. When the professional liability insurance Underwriters denied the officers coverage, the officers sued the Underwriters, alleging, among other claims, that the Underwriters had tortiously denied the officers coverage in bad faith and, in doing so, had also violated the Texas Insurance Code. Id. at 839, 845, 847. The Fifth Circuit held that the officers' extracontractual bad-faith claims were independent of any claims belonging to the Receiver because the bad-faith claims "lie directly against the Underwriters and do not involve proceeds from the insurance policies or other receivership assets." Id. at 847. Any recovery on those bad-faith claims "would not reduce or affect the policies' coverage limits" and, thus, would not come from the receivership res. Id. at 836. Under those circumstances, the Fifth Circuit held that the district court supervising the Bank receivership lacked the authority to bar the Bank officers' extracontractual bad-faith claims against the professional liability insurance Underwriters. Id. at 847–49.

The bad-faith claims at issue in Stanford International Bank, however, are distinguishable from the situation

presented here involving Peterson's and the Receiver's claims, which seek to recover from Chicago Title for the same Ponzi scheme conduct and losses. Our situation is more closely analogous to the claims at issue in Zacarias.

In a later case, the Fifth Circuit similarly distinguished Zacarias and Stanford International Bank. Specifically, the Fifth Circuit explained that the defendant professional liability insurance Underwriters in Stanford International Bank

> had not participated in the Ponzi scheme and the claims brought by the Stanford managers and employees were for "a distinct tort injury not based on any conduct in furtherance of the Ponzi scheme." In contrast, the defendants in Zacarias were "active co-conspirators in the Ponzi scheme," and the investors' claims arose from conduct in furtherance of that scheme.

Rotstain, 986 F.3d at 940 (quoting Zacarias, 945 F.3d at 901, and distinguishing it from Stanford Int'l Bank).**[13]**

---

[13] Another case on which Peterson relies, Digital Media Solutions, LLC v. South University of Ohio, LLC, 59 F.4th 772 (6th Cir. 2023), is similarly distinguishable. That case involved, not a Ponzi scheme, but a receivership for a company in significant debt. Id. at 774–75. The Sixth Circuit held that the district court overseeing the receivership had overstepped its authority by issuing bar orders that precluded third parties' claims, not only against the receivership, but also against other third parties outside the receivership. Id. at 774, 777, 781. Unlike this case (and Zacarias), there the improperly barred claims were for an injury that the receivership entity itself did not suffer and, therefore, the receiver could not assert claims for the same alleged losses. Id. at 776, 783–85.

### b. The bar order was necessary to protect the receivership assets

Barring Peterson's claims against Chicago Title was necessary to protect ANI receivership's assets for three reasons. First, the bar order was a necessary condition of the global settlement between the Receiver and Chicago Title, which benefitted the receivership estate as a whole by bringing in more than $24 million to pay defrauded investors' net losses. See DeYoung, 850 F.3d at 1182–83 (upholding bar order where "settlement offered the highest potential recovery for the Receiver Estate . . . [and] the Claims Bar Order was necessary to that settlement").

Second, without the global settlement, the Receiver would have had to continue to expend receivership resources litigating against Chicago Title. In addition, the Receiver would likely have been drawn into the investors' state-court actions against Chicago Title, also depleting receivership resources. Although Peterson asserts that "the mere possibility of future litigation costs is too speculative to directly affect the Receivership's assets," Zacarias considered additional legal expenses that the receiver might have to incur before upholding a global settlement and bar order in that case. See 945 F.3d at 900–01; see also DeYoung, 850 F.3d at 1182–83. Furthermore, the possibility that the Receiver would be brought into other existing and threatened lawsuits centered on the Ponzi scheme is not speculative.

Third, if the Receiver had not settled with Chicago Title, and if Peterson (or any other defrauded investors) had then succeeded in winning a judgment against Chicago Title for losses stemming from the Ponzi scheme, Chicago Title could have turned around and sought equitable indemnification

from the ANI Receiver for any such judgment. See Stanford Int'l Bank, 927 F.3d at 843 (distinguishing SEC v. Kaleta, 530 F.App'x 360 (5th Cir. 2013), where this possibility "would have diminished the recovery of all creditors against receivership assets," justifying a bar order to protect the receivership estate). That would have required an additional expenditure of receivership assets to defend against Chicago Title's indemnification claims and, if that defense failed, the cost of indemnification.

Peterson counters this third reason by arguing that, under California law, Chicago Title, as an intentional tortfeasor, could not have sought equitable indemnity against another intentional tortfeasor (the receivership entity ANI). There are several problems with Peterson's argument.

First, there has been no adjudication of Chicago Title's liability as an intentional tortfeasor for its role in the Ponzi scheme's fraud. In fact, Peterson's now-barred claims against Chicago Title involved both intentional and unintentional theories of recovery. Furthermore, the claims that the Receiver asserted against Chicago Title were not for intentional torts, but instead alleged respondeat superior, negligence, and breach of contract. See Leko v. Cornerstone Bldg. & Inspection Serv., 103 Cal. Rptr. 2d 858, 866 (Cal. Ct. App. 2001) (holding that it was error to grant judgment on the pleadings on a claim for equitable indemnity where the "complaint is not limited to intentional torts, and nothing precludes [one alleged tortfeasor] from seeking indemnity [from the other alleged tortfeasor] to the extent they are held liable for unintentional torts").

Second, even assuming that Chicago Title would have been adjudicated to be an intentional tortfeasor, there is no categorical bar forbidding one intentional tortfeasor from

seeking equitable indemnity against another; it is a case-specific inquiry. See Baird v. Jones, 27 Cal. Rptr. 2d 232, 233–34, 237–38 (Cal Ct. App. 1993); see also Henry v. Lehman Com. Paper (In re First All. Mortg. Co.), 471 F.3d 977, 1005 (9th Cir. 2006) (recognizing that California law allows "for comparative equitable indemnification among joint intentional tortfeasors" (citing Baird, 27 Cal. Rptr. 2d at 238)).**[14]**

Peterson argues that, even if Chicago Title could bring an equitable indemnification claim against ANI, equity likely would not allow Chicago Title to recover on that claim because Chicago Title's indemnification would deplete the ANI receivership estate, which would otherwise be distributed to innocent defrauded investors. Although any Chicago Title equitable indemnity claim asserted against the ANI Receiver might be unsuccessful, that is an argument that the parties would have had to litigate, and any such litigation would further deplete the ANI receivership's assets. See Zacarias, 945 F.3d at 900–01.

Peterson also asserts that California law would preclude Chicago Title from asserting an equitable indemnification

---

[14] See generally Leko, 104 Cal. Rptr. 2d at 864–65 (stating that, under California law, "[i]ndemnification between joint tortfeasors is an equitable rule created to correct potential injustice, and the doctrine is not available where it would operate against public policy"; further explaining, however, that "[i]n the great majority of cases . . . equity and fairness call for an apportionment of loss between the wrongdoers in proportion to their relative culpability, rather than the imposition of the entire loss upon one or the other tortfeasor" (citations omitted)). Also the California state trial judge overseeing the defrauded investors' claims against third parties arising from this Ponzi scheme has held that equitable indemnification claims under California law could go forward among those third parties alleged to have participated, knowingly or unwittingly, in Cain's Ponzi scheme.

claim against the Receiver because the ANI receivership was insolvent.  But Peterson fails to cite any case in support of this argument.  And even if Peterson's argument ultimately prevailed, it would again require further litigation that would have depleted the ANI receivership res. Id.

For the foregoing reasons, then, the district court did not err in deeming the Chicago Title bar order necessary to protect the ANI receivership's assets.

### c. Conclusion: The district court had authority to enter the Chicago Title bar order

We conclude that the district court had authority to enter the Chicago Title bar order because Peterson's claims substantially overlapped with the ANI Receiver's claims against Chicago Title and both sets of claims sought damages from Chicago Title for the same Ponzi scheme losses.  Barring Peterson's claims against Chicago Title was necessary to preserve the ANI receivership res.

### 2. The Anti-Injunction Act does not preclude the Chicago Title bar order

Peterson next argues that the Chicago Title bar order violates the AIA, which provides that a "court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.  The district court held that the Chicago Title bar order did not violate the AIA because that bar order was "necessary in aid" of the federal court's in rem "jurisdiction" over the ANI receivership's property.  We agree. See Zacarias, 945 F.3d at 902–03 (holding that order barring state proceeding that threatens receivership property was not precluded by the

AIA because it was in aid of federal court's jurisdiction over that property); see also Stanford Int'l Bank, 927 F.3d at 850–51.

### 3. The district court did not abuse its discretion in deeming the global settlement and the related Chicago Title bar order to be equitable

Peterson next asserts that the global settlement and Chicago Title bar order are unfair and inequitable. This court reviews for an abuse of discretion "the fairness of a settlement in an equity receivership proceeding" and the entry of a related bar order. Stanford Int'l Bank, 927 F.3d at 839.

Peterson first contends that the bar order, which extinguished his pending claims against Chicago Title, was inequitable because now he "can neither share in the Receiver's settlement with Chicago Title" (because he is a net Ponzi-scheme winner who will not recover through the distribution of the receivership estate) nor "seek direct relief from Chicago Title."

The Fifth Circuit has noted the importance of allowing receivership claimants whose claims against third parties were extinguished by a bar order an opportunity to recover for their losses instead through distributions from the receiver estate. See Stanford Int'l Bank, 927 F.3d at 845–47. In Stanford International Bank, the district court had barred the Bank officers' contractual claims seeking coverage as co-insureds under the same professional liability insurance policies under which the Receiver sought coverage. Id. at 835–36, 839, 845. Those policies and their proceeds were part of the Bank's receivership estate. Id. at 840. The Fifth Circuit held that, although barring the Bank officers' contractual claims seeking recovery under the

policies might have been appropriate, it was inequitable to bar the Bank officers' contractual claims without at least allowing the Bank officers "to access the [policies'] proceeds through the Receiver's claims process." Id. at 845. There, the global settlement "expressly foreclose[d] the [Bank officers] from sharing in the insurance policy proceeds of which they [were] coinsureds" and also did not allow the Bank officers "to file claims against the Receivership estate." Id. at 846.

That is not what occurred here, however. Peterson, in fact, was able to file claims seeking to recover for his Ponzi scheme losses through the receivership estate's distributions, just like all other claimants. Peterson was ultimately unable to recover on his claims only because the receivership had sufficient funds only to pay defrauded investors a percentage of their net losses, and the district court determined that Peterson was, instead, a net Ponzi scheme winner.[15] Thus, Peterson's properly-filed claim against the receivership estate was unsuccessful only because of a payment formula adopted by the Receiver that applied equally to all investors. Under those circumstances, the district court did not abuse its discretion by determining that an order barring Peterson's state-court claims against Chicago Title was not inequitable.

Next, Peterson points out that the Receiver is currently seeking to claw-back the $12.7 million Peterson purportedly made from the Ponzi scheme. That is a separate ongoing proceeding, however, that is not before this court.

Peterson also asserts that the global settlement between Chicago Title and the Receiver is unfair because it allows

---

[15] Peterson is challenging the district court's determination that he is a net Ponzi scheme winner in a separate appeal.

Chicago Title to participate, to a limited degree, in future distributions from the receivership estate. Peterson fails to explain how this provision of the settlement is unfair to him, a net Ponzi-scheme winner not entitled to recover anything from the receivership estate. In any event, the district court did not abuse its discretion by deeming the global settlement as a whole to be "fair and equitable and in the best interests of the estate." Id. at 840 (quoting Ritchie Cap. Mgmt., L.L.C. v. Kelley, 785 F.3d 273, 278 (8th Cir. 2015)).

### 4. In conclusion, we uphold the Chicago Title bar order

For the foregoing reasons, we conclude that the district court had authority to enter the Chicago Title bar order and did not abuse its discretion in doing so.

## C. Appeal No. 22-56208: Ovation's challenge to the Nossaman bar order[16]

Ovation, for its part, challenges the Nossaman bar order, which extinguished Ovation's state-court claims against Nossaman, Peterson's lawyer. Ovation, which manages an investment fund, invested over $50 million of its clients' money in the Ponzi scheme, ultimately losing more than $25 million. After the scheme unraveled, Ovation initially sued Chicago Title seeking to recover both for its investors' losses and for the management fees that Ovation lost when its clients left the Ovation-managed investment fund after it became known that Ovation had invested its clients' money

---

[16] We GRANT Nossaman's and Ovation's unopposed motions for judicial notice (Dkt. Nos. 41, 50) of documents filed in a California state court action, Ovation v. Chicago Title, No. 37-2020-00034947-CU-FR-CTL, and documents filed in the federal district court case underlying this appeal after this appeal was taken. See DeFiore v. SOC LLC, 85 F.4th 546, 559 n.10 (9th Cir. 2023).

in a Ponzi scheme.  Ovation did not sue Nossaman at that time but instead entered into an agreement with Nossaman tolling the time for Ovation to sue Nossaman.  Chicago Title, nevertheless, brought Nossaman into the Ovation-Chicago Title litigation by filing a cross-claim against Nossaman.

That litigation ended in a settlement.  Chicago Title agreed to pay Ovation $47 million, which covered all of Ovation's investors' losses, Ovation's attorneys' fees, and some ($10 million) of the management fees Ovation alleged that it lost as a result of the Ponzi scheme.  Chicago Title also settled its cross-claim against Nossaman when Nossaman agreed to pay Chicago Title $4.75 million.

Thereafter, when the Receiver and Chicago Title asked the district court to approve their global settlement, they requested that the district court also include an order barring claims against Nossaman stemming from the Ponzi scheme. While that request for the Nossaman bar order was pending, Ovation filed suit against Nossaman in California state court and then objected in federal court to the requested Nossaman bar order.  The district court entered the Nossaman bar order over Ovation's objection, extinguishing Ovation's then pending state-court claims against Nossaman.  Ovation challenges that bar order, arguing that 1) the district court had no authority to enter it; and 2) the bar order violated the AIA.  We reject both arguments and affirm the Nossaman bar order.

### 1. The district court had authority to enter the Nossaman bar order

We agree with the district court that it had authority to enter the Nossaman bar order based on the same reasoning that supported entry of the Chicago Title bar order: 1) Ovation's claims against Nossaman would have

substantially overlapped with claims that the ANI Receiver could have brought against Nossaman seeking to recover for the same losses caused by Nossaman's alleged conduct during the Ponzi scheme;[17] and 2) barring Ovation's claims against Nossaman was necessary to protect the ANI receivership res.[18]

### a. Ovation's claims against Nossaman substantially overlapped with, and sought to recover the same Ponzi-scheme losses as, claims that the Receiver could have asserted against Nossaman

The Receiver could have asserted claims against Nossaman seeking to recover for "additional liability" that the ANI receivership incurred as a result of Nossaman's conduct during the Ponzi scheme. Rotstain, 986 F.3d at 941. That is what Ovation sought from Nossaman—losses that

---

[17] In fact, Nossaman actually sought approval from the district court to sue the Receiver, but as noted infra p. 30, the district court deemed that motion to be moot after issuing the Nossaman bar order. And, if the court had permitted Nossaman's claims against the Receiver, it likely would have led to further litigation in which the Receiver would have sued Nossaman.

[18] Ovation asserts in a Fed. R. App. P. 28(j) letter that the Supreme Court's recent decision in Harrington v. Purdue Pharma L.P., 603 U.S. 204 (2024), supports its argument that "a district court may not 'permanently bar and extinguish independent, non-derivative third party-claims that do not affect the res of the receivership estate.'" (quoting Stanford Int'l Bank, 927 F.3d at 843). Harrington does not apply here because it specifically addressed whether the bankruptcy code permitted the court overseeing Purdue Pharma's bankruptcy to bar claims against, not the debtor itself, but individuals who own the corporate debtor. See 603 U.S. at 209. That case construed several specific bankruptcy code provisions, see id. at 214, that are not implicated here.

Case: 22-56206, 02/24/2025, ID: 12922160, DktEntry: 81, Page 29 of 32

USSEC v. CHICAGO TITLE COMPANY                    29

Ovation suffered as a result of Nossaman's conduct in
helping dupe Ovation into investing its clients' money in the
Ponzi scheme.  See Zacarias, 945 F.3d at 904–05; see also
DeYoung, 850 F.3d at 1175–76.

Ovation contends, to the contrary, that the losses it seeks
to recover from Nossaman—Ovation's lost management
fees—are distinct losses unique to Ovation as an investment
fund manager because the Receiver did not claim, nor could
she, that the receivership estate had such a claim.   But
Ovation's lost management fees still resulted from the Ponzi
scheme, even though Ovation sought to recover based on a
different legal theory than the defrauded investors asserted.
See Zacarias, 945 F.3d at 900; DeYoung, 850 F.3d at 1175–
76.  That is enough.  ANI would have been liable to Ovation
for the losses Ovation suffered as the result of the Ponzi
scheme.  The Receiver, in turn, could have recovered from
Nossaman for any liability that ANI would have because of
Nossaman's participation, even unwittingly, in the Ponzi
scheme.

Ovation counters that, although the Receiver could have
asserted claims against Nossaman for any liability that ANI
might have because of Nossaman's conduct, the Receiver
never actually asserted such claims.  That does not deprive
the district court of the authority to enter the Nossaman bar
order, however, because the claims among the third parties
who allegedly facilitated Cain's Ponzi scheme, including
ANI, Chicago Title, and Nossaman, are all intertwined and
would be based on the alleged harm caused by the Ponzi
scheme.  See DeYoung, 850 F.3d at 1175–76.  Although the
Receiver could have brought claims against Nossaman
seeking to recover for ANI's liability to those who lost
money in the Ponzi scheme, including Ovation, the Receiver
did sue Chicago Title, which in turn brought Nossaman into

that case via a cross-claim against Nossaman. This entanglement is further illustrated by Ovation's recovery from Chicago Title of some of its lost management fees. Furthermore, once Ovation sued Nossaman, after the motion for the Nossaman bar order was filed, Nossaman requested the district court's permission to assert equitable indemnity claims against the Receiver. The district court deemed that motion moot after issuing the Nossaman bar order. Given the entanglement among all those who allegedly operated and facilitated the Ponzi scheme, the district court had authority to bar claims against Nossaman to prevent those claims from interfering with administration of the ANI receivership.

### b. The bar order was necessary to protect the ANI receivership assets

We further conclude, as did the district court, that entering the Nossaman bar order was necessary to protect the ANI receivership's res because, if any party who lost money because of the Ponzi scheme succeeded in winning a judgment against Nossaman, Nossaman in turn could have pursued equitable indemnification claims against the ANI Receiver. The Receiver would have had to expend receivership assets to defend such claims, even if the Receiver ultimately prevailed.

Ovation asserts that barring claims against Nossaman was not necessary to protect the receivership res because, under California law, 1) Nossaman, an intentional tortfeasor, cannot seek equitable indemnification from ANI, another intentional tortfeasor; and 2) even if Nossaman could assert such a claim against the ANI receivership, Nossaman would not prevail. We previously rejected both arguments in discussing Peterson's claims against Chicago Title. See

supra pp. 21–23.**[19]**  That same reasoning applies here.  We therefore conclude that the district court had authority to enter the Nossaman bar order, and the bar order was necessary to protect the receivership res.

## 2. The Anti-Injunction Act does not preclude the Nossaman bar order

Lastly, Ovation argues that the AIA precludes the Nossaman bar order.  As a threshold matter, Nossaman contends that the AIA does not apply to this order because Ovation had not yet sued Nossaman at the time that the Receiver filed her motion asking the district court to issue the Nossaman bar.

The AIA does "not preclude injunctions against the [future] institution of state court proceedings, but only bar[s] stays of suits already instituted."  Dombrowski v. Pfister, 380 U.S. 479, 484 n.2 (1965).  Here, the relevant chronology is as follows: The Receiver moved for the Nossaman bar order in this SEC federal action; Ovation then sued Nossaman in California state court; and, thereafter, the federal court issued the challenged Nossaman bar order.

---

[19] Ovation asserts that California Civil Procedure Code § 875(d) also precludes Nossaman from obtaining indemnity against the Receiver.  Section 875 addresses judgments against two or more defendants in a tort action.  Cal. Civ. Proc. Code § 875.  Section 875(d) provides that "[t]here shall be no right of contribution in favor of any tortfeasor who has intentionally injured the injured person."  Ovation contends that this provision addressing "contribution" would also applies to equitable indemnity.  Regardless of whether such a claim would ultimately prevail, that is another issue that the parties would have to litigate to resolve, thereby expending receivership assets.

Other circuits are divided as to whether the AIA applies in such a situation.[20]

We need not decide that question here, however. Even assuming the AIA applies, the Nossaman bar order falls within the AIA's exception for an injunction enjoining state-court litigation that is "necessary in aid" of the federal court's jurisdiction. 28 U.S.C. § 2283. The Nossaman bar order was "necessary in aid" of the district court's in rem jurisdiction over the ANI receivership's res. See Zacarias, 945 F.3d at 902–03; see also Stanford Int'l Bank, 927 F.3d at 850–51.

## III. CONCLUSION

For the foregoing reasons, we conclude that the district court had authority to enter the challenged bar orders and that the AIA did not preclude them. Moreover, we reject Peterson's argument that the Chicago Title bar order, in particular, was unfair to him.

**AFFIRMED.**

---

[20] The Seventh Circuit has held that the AIA does not apply to state-court litigation that is initiated after a motion for an order enjoining state-court litigation is filed in federal court. See Barancik v. Inv. Funding Corp., 489 F.2d 933, 936–38 (7th Cir. 1973); see also Hyde Park Partners, L.P. v. Connolly, 839 F.2d 837, 842 n.6 (1st Cir. 1988) (dicta); Nat'l City Line, Inc. v. LLC Corp., 687 F.2d 1122, 1127–28 (8th Cir. 1982). Other circuits, however, have rejected Barancik's reasoning and concluded, instead, that the AIA applies when a state-court case is initiated before the federal court rules on the motion for an order enjoining state-court litigation. See Denny's, Inc. v. Cake, 364 F.3d 521, 528–31 (4th Cir. 2004); Roth v. Bank of Commonwealth, 583 F.2d 527, 528 (6th Cir. 1977); see also Standard Microsystems Corp. v. Tex. Instruments Inc., 916 F.2d 58, 61–62 (2d Cir. 1990) (not deciding the question but criticizing Barancik's reasoning and noting "considerable doubt [as to] whether the Barancik rule should be adopted").